Chief Justice ROBERTS delivered the opinion of the Court.
A United States patent entitles the patent holder (the "patentee"), for a period of 20 years, to "exclude others from making, using, offering for sale, or selling [its] invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154(a). Whoever engages in one of these acts "without authority" from the patentee may face liability for patent infringement. § 271(a).
When a patentee sells one of its products, however, the patentee can no longer control that item through the patent laws-its patent rights are said to "exhaust." The purchaser and all subsequent owners are free to use or resell the product just like any other item of personal property, without fear of an infringement lawsuit.
This case presents two questions about the scope of the patent exhaustion doctrine: First, whether a patentee that sells an item under an express restriction on the purchaser's right to reuse or resell the product may enforce that restriction through an infringement lawsuit. And second, whether a patentee exhausts its patent rights by selling its product outside the United States, where American patent laws do not apply. We conclude that a patentee's decision to sell a product exhausts all of its patent rights in that item, regardless of any restrictions the patentee purports to impose or the location of the sale.
I
The underlying dispute in this case is about laser printers-or, more specifically, the cartridges that contain the powdery substance, known as toner, that laser printers use to make an image appear on paper. Respondent Lexmark International, Inc. designs, manufactures, and sells toner cartridges to consumers in the United States and around the globe. It owns a number of patents that cover components of those cartridges and the manner in which they are used.
When toner cartridges run out of toner they can be refilled and used again. This creates an opportunity for other companies-known as remanufacturers-to acquire empty Lexmark cartridges from purchasers in the United States and abroad, refill them with toner, and then resell them at a lower price than the new ones Lexmark puts on the shelves.
Not blind to this business problem, Lexmark structures its sales in a way that encourages customers to return spent cartridges. It gives purchasers two options: One is to buy a toner cartridge at full price, with no strings attached. The other is to buy a cartridge at roughly 20-percent *1530 off through Lexmark's "Return Program." A customer who buys through the Return Program still owns the cartridge but, in exchange for the lower price, signs a contract agreeing to use it only once and to refrain from transferring the empty cartridge to anyone but Lexmark. To enforce this single-use/no-resale restriction, Lexmark installs a microchip on each Return Program cartridge that prevents reuse once the toner in the cartridge runs out.
Lexmark's strategy just spurred remanufacturers to get more creative. Many kept acquiring empty Return Program cartridges and developed methods to counteract the effect of the microchips. With that technological obstacle out of the way, there was little to prevent the remanufacturers from using the Return Program cartridges in their resale business. After all, Lexmark's contractual single-use/no-resale agreements were with the initial customers, not with downstream purchasers like the remanufacturers.
Lexmark, however, was not so ready to concede that its plan had been foiled. In 2010, it sued a number of remanufacturers, including petitioner Impression Products, Inc., for patent infringement with respect to two groups of cartridges. One group consists of Return Program cartridges that Lexmark sold within the United States. Lexmark argued that, because it expressly prohibited reuse and resale of these cartridges, the remanufacturers infringed the Lexmark patents when they refurbished and resold them. The other group consists of all toner cartridges that Lexmark sold abroad and that remanufacturers imported into the country. Lexmark claimed that it never gave anyone authority to import these cartridges, so the remanufacturers ran afoul of its patent rights by doing just that.
Eventually, the lawsuit was whittled down to one defendant, Impression Products, and one defense: that Lexmark's sales, both in the United States and abroad, exhausted its patent rights in the cartridges, so Impression Products was free to refurbish and resell them, and to import them if acquired abroad. Impression Products filed separate motions to dismiss with respect to both groups of cartridges. The District Court granted the motion as to the domestic Return Program cartridges, but denied the motion as to the cartridges Lexmark sold abroad. Both parties appealed.
The Federal Circuit considered the appeals en banc and ruled for Lexmark with respect to both groups of cartridges. The court began with the Return Program cartridges that Lexmark sold in the United States. Relying on its decision in Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (1992), the Federal Circuit held that a patentee may sell an item and retain the right to enforce, through patent infringement lawsuits, "clearly communicated, ... lawful restriction[s] as to post-sale use or resale." 816 F.3d 721, 735 (2016). The exhaustion doctrine, the court reasoned, derives from the prohibition on making, using, selling, or importing items "without authority." Id., at 734 (quoting 35 U.S.C. § 271(a) ). When you purchase an item you presumptively also acquire the authority to use or resell the item freely, but that is just a presumption; the same authority does not run with the item when the seller restricts post-sale use or resale. 816 F.3d, at 742. Because the parties agreed that Impression Products knew about Lexmark's restrictions and that those restrictions did not violate any laws, the Federal Circuit concluded that Lexmark's sales had not exhausted all of its patent rights, and that the company could sue for infringement when Impression Products refurbished *1531 and resold Return Program cartridges.
As for the cartridges that Lexmark sold abroad, the Federal Circuit once again looked to its precedent. In Jazz Photo Corp. v. International Trade Commission, 264 F.3d 1094 (2001), the court had held that a patentee's decision to sell a product abroad did not terminate its ability to bring an infringement suit against a buyer that "import[ed] the article and [sold] ... it in the United States." 816 F.3d, at 726-727. That rule, the court concluded, makes good sense: Exhaustion is justified when a patentee receives "the reward available from [selling in] American markets," which does not occur when the patentee sells overseas, where the American patent offers no protection and therefore cannot bolster the price of the patentee's goods. Id., at 760-761. As a result, Lexmark was free to exercise its patent rights to sue Impression Products for bringing the foreign-sold cartridges to market in the United States.
Judge Dyk, joined by Judge Hughes, dissented. In their view, selling the Return Program cartridges in the United States exhausted Lexmark's patent rights in those items because any "authorized sale of a patented article ... free[s] the article from any restrictions on use or sale based on the patent laws." Id., at 775-776. As for the foreign cartridges, the dissenters would have held that a sale abroad also results in exhaustion, unless the seller "explicitly reserve[s] [its] United States patent rights" at the time of sale. Id., at 774, 788. Because Lexmark failed to make such an express reservation, its foreign sales exhausted its patent rights.
We granted certiorari to consider the Federal Circuit's decisions with respect to both domestic and international exhaustion, 580 U.S. ----, 137 S.Ct. 546, 196 L.Ed.2d 442 (2016), and now reverse.
II
A
First up are the Return Program cartridges that Lexmark sold in the United States. We conclude that Lexmark exhausted its patent rights in these cartridges the moment it sold them. The single-use/no-resale restrictions in Lexmark's contracts with customers may have been clear and enforceable under contract law, but they do not entitle Lexmark to retain patent rights in an item that it has elected to sell.
The Patent Act grants patentees the "right to exclude others from making, using, offering for sale, or selling [their] invention[s]." 35 U.S.C. § 154(a). For over 160 years, the doctrine of patent exhaustion has imposed a limit on that right to exclude. See Bloomer v. McQuewan, 14 How. 539, 14 L.Ed. 532 (1853). The limit functions automatically: When a patentee chooses to sell an item, that product "is no longer within the limits of the monopoly" and instead becomes the "private, individual property" of the purchaser, with the rights and benefits that come along with ownership. Id., at 549-550. A patentee is free to set the price and negotiate contracts with purchasers, but may not, "by virtue of his patent, control the use or disposition" of the product after ownership passes to the purchaser. United States v. Univis Lens Co., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942) (emphasis added). The sale "terminates all patent rights to that item." Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617, 625, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008).
This well-established exhaustion rule marks the point where patent rights yield to the common law principle against restraints on alienation. The Patent Act *1532 "promote[s] the progress of science and the useful arts by granting to [inventors] a limited monopoly" that allows them to "secure the financial rewards" for their inventions. Univis, 316 U.S., at 250, 62 S.Ct. 1088. But once a patentee sells an item, it has "enjoyed all the rights secured" by that limited monopoly. Keeler v. Standard Folding Bed Co., 157 U.S. 659, 661, 15 S.Ct. 738, 39 L.Ed. 848 (1895). Because "the purpose of the patent law is fulfilled ... when the patentee has received his reward for the use of his invention," that law furnishes "no basis for restraining the use and enjoyment of the thing sold." Univis, 316 U.S., at 251, 62 S.Ct. 1088.
We have explained in the context of copyright law that exhaustion has "an impeccable historic pedigree," tracing its lineage back to the "common law's refusal to permit restraints on the alienation of chattels." Kirtsaeng v. John Wiley & Sons, Inc., 568 U.S. 519, 538, 133 S.Ct. 1351, 185 L.Ed.2d 392 (2013). As Lord Coke put it in the 17th century, if an owner restricts the resale or use of an item after selling it, that restriction "is voide, because ... it is against Trade and Traffique, and bargaining and contracting betweene man and man." 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628); see J. Gray, Restraints on the Alienation of Property § 27, p. 18 (2d ed. 1895) ("A condition or conditional limitation on alienation attached to a transfer of the entire interest in personalty is as void as if attached to a fee simple in land").
This venerable principle is not, as the Federal Circuit dismissively viewed it, merely "one common-law jurisdiction's general judicial policy at one time toward anti-alienation restrictions." 816 F.3d, at 750. Congress enacted and has repeatedly revised the Patent Act against the backdrop of the hostility toward restraints on alienation. That enmity is reflected in the exhaustion doctrine. The patent laws do not include the right to "restrain [ ] ... further alienation" after an initial sale; such conditions have been "hateful to the law from Lord Coke's day to ours" and are "obnoxious to the public interest." Straus v. Victor Talking Machine Co., 243 U.S. 490, 501, 37 S.Ct. 412, 61 L.Ed. 866 (1917). "The inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require illustration." Keeler, 157 U.S., at 667, 15 S.Ct. 738.
But an illustration never hurts. Take a shop that restores and sells used cars. The business works because the shop can rest assured that, so long as those bringing in the cars own them, the shop is free to repair and resell those vehicles. That smooth flow of commerce would sputter if companies that make the thousands of parts that go into a vehicle could keep their patent rights after the first sale. Those companies might, for instance, restrict resale rights and sue the shop owner for patent infringement. And even if they refrained from imposing such restrictions, the very threat of patent liability would force the shop to invest in efforts to protect itself from hidden lawsuits. Either way, extending the patent rights beyond the first sale would clog the channels of commerce, with little benefit from the extra control that the patentees retain. And advances in technology, along with increasingly complex supply chains, magnify the problem. See Brief for Costco Wholesale Corp. et al. as Amici Curiae 7-9; Brief for Intel Corp. et al. as Amici Curiae 17, n. 5 ("A generic smartphone assembled from various high-tech components could practice an estimated 250,000 patents").
This Court accordingly has long held that, even when a patentee sells an item under an express restriction, the patentee does not retain patent rights in that *1533 product. In Boston Store of Chicago v. American Graphophone Co., for example, a manufacturer sold graphophones-one of the earliest devices for recording and reproducing sounds-to retailers under contracts requiring those stores to resell at a specific price. 246 U.S. 8, 17-18, 38 S.Ct. 257, 62 L.Ed. 551 (1918). When the manufacturer brought a patent infringement suit against a retailer who sold for less, we concluded that there was "no room for controversy" about the result: By selling the item, the manufacturer placed it "beyond the confines of the patent law, [and] could not, by qualifying restrictions as to use, keep [it] under the patent monopoly." Id., at 20, 25, 38 S.Ct. 257.
Two decades later, we confronted a similar arrangement in United States v. Univis Lens Co . There, a company that made eyeglass lenses authorized an agent to sell its products to wholesalers and retailers only if they promised to market the lenses at fixed prices. The Government filed an antitrust lawsuit, and the company defended its arrangement on the ground that it was exercising authority under the Patent Act. We held that the initial sales "relinquish [ed] ... the patent monopoly with respect to the article[s] sold," so the "stipulation ... fixing resale prices derive[d] no support from the patent and must stand on the same footing" as restrictions on unpatented goods. 316 U.S., at 249-251, 62 S.Ct. 1088.
It is true that Boston Store and Univis involved resale price restrictions that, at the time of those decisions, violated the antitrust laws. But in both cases it was the sale of the items, rather than the illegality of the restrictions, that prevented the patentees from enforcing those resale price agreements through patent infringement suits. And if there were any lingering doubt that patent exhaustion applies even when a sale is subject to an express, otherwise lawful restriction, our recent decision in Quanta Computer, Inc. v. LG Electronics, Inc. settled the matter. In that case, a technology company-with authorization from the patentee-sold microprocessors under contracts requiring purchasers to use those processors with other parts that the company manufactured. One buyer disregarded the restriction, and the patentee sued for infringement. Without so much as mentioning the lawfulness of the contract, we held that the patentee could not bring an infringement suit because the "authorized sale ... took its products outside the scope of the patent monopoly." 553 U.S., at 638, 128 S.Ct. 2109.
Turning to the case at hand, we conclude that this well-settled line of precedent allows for only one answer: Lexmark cannot bring a patent infringement suit against Impression Products to enforce the single-use/no-resale provision accompanying its Return Program cartridges. Once sold, the Return Program cartridges passed outside of the patent monopoly, and whatever rights Lexmark retained are a matter of the contracts with its purchasers, not the patent law.
B
The Federal Circuit reached a different result largely because it got off on the wrong foot. The "exhaustion doctrine," the court believed, "must be understood as an interpretation of" the infringement statute, which prohibits anyone from using or selling a patented article "without authority" from the patentee. 816 F.3d, at 734 (quoting 35 U.S.C. § 271(a) ). Exhaustion reflects a default rule that a patentee's decision to sell an item "presumptively grant[s] 'authority' to the purchaser to use it and resell it." 816 F.3d, at 742. But, the Federal Circuit explained, the patentee does not have to hand over the full "bundle *1534 of rights" every time. Id., at 741 (internal quotation marks omitted). If the patentee expressly withholds a stick from the bundle-perhaps by restricting the purchaser's resale rights-the buyer never acquires that withheld authority, and the patentee may continue to enforce its right to exclude that practice under the patent laws.
The misstep in this logic is that the exhaustion doctrine is not a presumption about the authority that comes along with a sale; it is instead a limit on "the scope of the patentee's rights ." United States v. General Elec. Co., 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362 (1926) (emphasis added). The right to use, sell, or import an item exists independently of the Patent Act. What a patent adds-and grants exclusively to the patentee-is a limited right to prevent others from engaging in those practices. See Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 35, 43 S.Ct. 254, 67 L.Ed. 516 (1923). Exhaustion extinguishes that exclusionary power. See Bloomer, 14 How., at 549 (the purchaser "exercises no rights created by the act of Congress, nor does he derive title to [the item] by virtue of the ... exclusive privilege granted to the patentee"). As a result, the sale transfers the right to use, sell, or import because those are the rights that come along with ownership, and the buyer is free and clear of an infringement lawsuit because there is no exclusionary right left to enforce.
The Federal Circuit also expressed concern that preventing patentees from reserving patent rights when they sell goods would create an artificial distinction between such sales and sales by licensees. Patentees, the court explained, often license others to make and sell their products, and may place restrictions on those licenses. A computer developer could, for instance, license a manufacturer to make its patented devices and sell them only for non-commercial use by individuals. If a licensee breaches the license by selling a computer for commercial use, the patentee can sue the licensee for infringement. And, in the Federal Circuit's view, our decision in General Talking PicturesCorp. v. Western Elec. Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, aff'd on reh'g, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938), established that-when a patentee grants a license "under clearly stated restrictions on post-sale activities" of those who purchase products from the licensee-the patentee can also sue for infringement those purchasers who knowingly violate the restrictions. 816 F.3d, at 743-744. If patentees can employ licenses to impose post-sale restrictions on purchasers that are enforceable through infringement suits, the court concluded, it would make little sense to prevent patentees from doing so when they sell directly to consumers.
The Federal Circuit's concern is misplaced. A patentee can impose restrictions on licensees because a license does not implicate the same concerns about restraints on alienation as a sale. Patent exhaustion reflects the principle that, when an item passes into commerce, it should not be shaded by a legal cloud on title as it moves through the marketplace. But a license is not about passing title to a product, it is about changing the contours of the patentee's monopoly: The patentee agrees not to exclude a licensee from making or selling the patented invention, expanding the club of authorized producers and sellers. See General Elec. Co., 272 U.S., at 489-490, 47 S.Ct. 192. Because the patentee is exchanging rights, not goods, it is free to relinquish only a portion of its bundle of patent protections.
A patentee's authority to limit licensees does not, as the Federal Circuit thought, mean that patentees can use licenses *1535 to impose post-sale restrictions on purchasers that are enforceable through the patent laws. So long as a licensee complies with the license when selling an item, the patentee has, in effect, authorized the sale. That licensee's sale is treated, for purposes of patent exhaustion, as if the patentee made the sale itself. The result: The sale exhausts the patentee's rights in that item. See Hobbie v. Jennison, 149 U.S. 355, 362-363, 13 S.Ct. 879, 37 L.Ed. 766 (1893). A license may require the licensee to impose a restriction on purchasers, like the license limiting the computer manufacturer to selling for non-commercial use by individuals. But if the licensee does so-by, perhaps, having each customer sign a contract promising not to use the computers in business-the sale nonetheless exhausts all patent rights in the item sold. See Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 506-507, 516, 37 S.Ct. 416, 61 L.Ed. 871 (1917). The purchasers might not comply with the restriction, but the only recourse for the licensee is through contract law, just as if the patentee itself sold the item with a restriction.
General Talking Pictures involved a fundamentally different situation: There, a licensee "knowingly ma[de] ... sales ... outside the scope of its license." 304 U.S., at 181-182, 58 S.Ct. 849 (emphasis added). We treated the sale "as if no license whatsoever had been granted" by the patentee, which meant that the patentee could sue both the licensee and the purchaser-who knew about the breach-for infringement. General Talking Pictures Corp. v. Western Elec. Co., 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81 (1938). This does not mean that patentees can use licenses to impose post-sale restraints on purchasers. Quite the contrary: The licensee infringed the patentee's rights because it did not comply with the terms of its license, and the patentee could bring a patent suit against the purchaser only because the purchaser participated in the licensee's infringement. General Talking Pictures, then, stands for the modest principle that, if a patentee has not given authority for a licensee to make a sale, that sale cannot exhaust the patentee's rights.
In sum, patent exhaustion is uniform and automatic. Once a patentee decides to sell-whether on its own or through a licensee-that sale exhausts its patent rights, regardless of any post-sale restrictions the patentee purports to impose, either directly or through a license.
III
Our conclusion that Lexmark exhausted its patent rights when it sold the domestic Return Program cartridges goes only halfway to resolving this case. Lexmark also sold toner cartridges abroad and sued Impression Products for patent infringement for "importing [Lexmark's] invention into the United States." 35 U.S.C. § 154(a). Lexmark contends that it may sue for infringement with respect to all of the imported cartridges-not just those in the Return Program-because a foreign sale does not trigger patent exhaustion unless the patentee "expressly or implicitly transfer[s] or license[s]" its rights. Brief for Respondent 36-37. The Federal Circuit agreed, but we do not. An authorized sale outside the United States, just as one within the United States, exhausts all rights under the Patent Act.
This question about international exhaustion of intellectual property rights has also arisen in the context of copyright law. Under the "first sale doctrine," which is codified at 17 U.S.C. § 109(a), when a copyright owner sells a lawfully made copy of its work, it loses the power to restrict the purchaser's freedom "to sell or otherwise dispose of ... that copy." In *1536 Kirtsaeng v. John Wiley & Sons, Inc., we held that this " 'first sale' [rule] applies to copies of a copyrighted work lawfully made [and sold] abroad." 568 U.S., at 525, 133 S.Ct. 1351. We began with the text of § 109(a), but it was not decisive: The language neither "restrict [s] the scope of [the] 'first sale' doctrine geographically," nor clearly embraces international exhaustion. Id., at 528-533, 133 S.Ct. 1351. What helped tip the scales for global exhaustion was the fact that the first sale doctrine originated in "the common law's refusal to permit restraints on the alienation of chattels." Id., at 538, 133 S.Ct. 1351. That "common-law doctrine makes no geographical distinctions." Id., at 539, 133 S.Ct. 1351. The lack of any textual basis for distinguishing between domestic and international sales meant that "a straightforward application" of the first sale doctrine required the conclusion that it applies overseas. Id., at 540, 133 S.Ct. 1351 (internal quotation marks omitted).
Applying patent exhaustion to foreign sales is just as straightforward. Patent exhaustion, too, has its roots in the antipathy toward restraints on alienation, see supra, at 1528 - 1533, and nothing in the text or history of the Patent Act shows that Congress intended to confine that borderless common law principle to domestic sales. In fact, Congress has not altered patent exhaustion at all; it remains an unwritten limit on the scope of the patentee's monopoly. See Astoria Fed. Sav. & Loan Assn. v. Solimino, 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("[W]here a common-law principle is well established, ... courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident" (internal quotation marks omitted)). And differentiating the patent exhaustion and copyright first sale doctrines would make little theoretical or practical sense: The two share a "strong similarity ... and identity of purpose," Bauer & Cie v. O'Donnell, 229 U.S. 1, 13, 33 S.Ct. 616, 57 L.Ed. 1041 (1913), and many everyday products-"automobiles, microwaves, calculators, mobile phones, tablets, and personal computers"-are subject to both patent and copyright protections, see Kirtsaeng, 568 U.S., at 545, 133 S.Ct. 1351 ; Brief for Costco Wholesale Corp. et al. as Amici Curiae 14-15. There is a "historic kinship between patent law and copyright law," Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 439, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), and the bond between the two leaves no room for a rift on the question of international exhaustion.
Lexmark sees the matter differently. The Patent Act, it points out, limits the patentee's "right to exclude others" from making, using, selling, or importing its products to acts that occur in the United States. 35 U.S.C. § 154(a). A domestic sale, it argues, triggers exhaustion because the sale compensates the patentee for "surrendering [those] U.S. rights." Brief for Respondent 38. A foreign sale is different: The Patent Act does not give patentees exclusionary powers abroad. Without those powers, a patentee selling in a foreign market may not be able to sell its product for the same price that it could in the United States, and therefore is not sure to receive "the reward guaranteed by U.S. patent law." Id., at 39 (internal quotation marks omitted). Absent that reward, says Lexmark, there should be no exhaustion. In short, there is no patent exhaustion from sales abroad because there are no patent rights abroad to exhaust.
The territorial limit on patent rights is, however, no basis for distinguishing copyright protections; those protections *1537 "do not have any extraterritorial operation" either. 5 M. Nimmer & D. Nimmer, Copyright § 17.02, p. 17-26 (2017). Nor does the territorial limit support the premise of Lexmark's argument. Exhaustion is a separate limit on the patent grant, and does not depend on the patentee receiving some undefined premium for selling the right to access the American market. A purchaser buys an item, not patent rights. And exhaustion is triggered by the patentee's decision to give that item up and receive whatever fee it decides is appropriate "for the article and the invention which it embodies." Univis, 316 U.S., at 251, 62 S.Ct. 1088. The patentee may not be able to command the same amount for its products abroad as it does in the United States. But the Patent Act does not guarantee a particular price, much less the price from selling to American consumers. Instead, the right to exclude just ensures that the patentee receives one reward-of whatever amount the patentee deems to be "satisfactory compensation," Keeler, 157 U.S., at 661, 15 S.Ct. 738 -for every item that passes outside the scope of the patent monopoly.
This Court has addressed international patent exhaustion in only one case, Boesch v. Graff, decided over 125 years ago. All that case illustrates is that a sale abroad does not exhaust a patentee's rights when the patentee had nothing to do with the transaction. Boesch -from the days before the widespread adoption of electrical lighting-involved a retailer who purchased lamp burners from a manufacturer in Germany, with plans to sell them in the United States. The manufacturer had authority to make the burners under German law, but there was a hitch: Two individuals with no ties to the German manufacturer held the American patent to that invention. These patentees sued the retailer for infringement when the retailer imported the lamp burners into the United States, and we rejected the argument that the German manufacturer's sale had exhausted the American patentees' rights. The German manufacturer had no permission to sell in the United States from the American patentees, and the American patentees had not exhausted their patent rights in the products because they had not sold them to anyone, so "purchasers from [the German manufacturer] could not be thereby authorized to sell the articles in the United States." 133 U.S. 697, 703, 10 S.Ct. 378, 33 L.Ed. 787 (1890).
Our decision did not, as Lexmark contends, exempt all foreign sales from patent exhaustion. See Brief for Respondent 44-45. Rather, it reaffirmed the basic premise that only the patentee can decide whether to make a sale that exhausts its patent rights in an item. The American patentees did not do so with respect to the German products, so the German sales did not exhaust their rights.
Finally, the United States, as an amicus, advocates what it views as a middle-ground position: that "a foreign sale authorized by the U.S. patentee exhausts U.S. patent rights unless those rights are expressly reserved." Brief for United States 7-8. Its position is largely based on policy rather than principle. The Government thinks that an overseas "buyer's legitimate expectation" is that a "sale conveys all of the seller's interest in the patented article," so the presumption should be that a foreign sale triggers exhaustion. Id., at 32-33. But, at the same time, "lower courts long ago coalesced around" the rule that "a patentee's express reservation of U.S. patent rights at the time of a foreign sale will be given effect," so that option should remain open to the patentee. Id., at 22 (emphasis deleted).
The Government has little more than "long ago" on its side. In the 1890s, two *1538 circuit courts-in cases involving the same company-did hold that patentees may use express restrictions to reserve their patent rights in connection with foreign sales. See Dickerson v. Tinling, 84 F. 192, 194-195 (C.A.8 1897) ; Dickerson v. Matheson, 57 F. 524, 527 (C.A.2 1893). But no "coalesc[ing]" ever took place: Over the following hundred-plus years, only a smattering of lower court decisions mentioned this express-reservation rule for foreign sales. See, e.g ., Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc., 565 F.Supp. 931, 938 (D.N.J.1983). And in 2001, the Federal Circuit adopted its blanket rule that foreign sales do not trigger exhaustion, even if the patentee fails to expressly reserve its rights. Jazz Photo, 264 F.3d, at 1105. These sparse and inconsistent decisions provide no basis for any expectation, let alone a settled one, that patentees can reserve patent rights when they sell abroad.
The theory behind the Government's express-reservation rule also wrongly focuses on the likely expectations of the patentee and purchaser during a sale. Exhaustion does not arise because of the parties' expectations about how sales transfer patent rights. More is at stake when it comes to patents than simply the dealings between the parties, which can be addressed through contract law. Instead, exhaustion occurs because, in a sale, the patentee elects to give up title to an item in exchange for payment. Allowing patent rights to stick remora-like to that item as it flows through the market would violate the principle against restraints on alienation. Exhaustion does not depend on whether the patentee receives a premium for selling in the United States, or the type of rights that buyers expect to receive. As a result, restrictions and location are irrelevant; what matters is the patentee's decision to make a sale.
* * *
The judgment of the United States Court of Appeals for the Federal Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.
Justice GORSUCH took no part in the consideration or decision of this case.